DONNA FRENCH, Plaintiff-Appellee, v. THE CITY OF SPRINGFIELD, Defendant-Appellant.

(No. 12890;

Fourth District—July 31, 1975.

D. Bradley Blodgett, Corporation Counsel, and Walter J. Simhauser both of Springfield, for appellant.

Thomas F. Londrigan, of Londrigan & Potter, P.C., of Springfield, for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

Plaintiff Donna French was severely injured when the automobile in which she was riding as a guest passenger collided with a utility pole in the 2400 block of South Fifth Street in Springfield in the early morning hours of January 26, 1969. She filed separate complaints seeking recovery for these injuries against defendants City of Springfield (City) and Virgil C. McCarty, administrator of the estate of Phillip C. McCarty, deceased, General Motors Company, the manufacturer of the car and the retail seller of the car. Phillip C. McCarty was the driver of the automobile and was killed in the collision. At the first trial of the case against defendant City, judgment was entered on a verdict in favor of that defendant. This court heard the appeal from that judgment and rendered its decision in *French v. City of Springfield*, 5 Ill.App.3d 368, 283 N.E.2d 18, reversing and remanding the case for a new trial. We found the admission of certain evidence as to the possible intoxication of Phillip C. McCarty, offered on the theory that his intoxication was the sole proximate cause of the collision, to be reversible error.

After remand the two cases were consolidated for trial. Upon plaintiff's motion, defendants General Motors and the retailer were dismissed pursuant to a covenant not to sue. Upon retrial, the jury returned a verdict for the plaintiff and against the defendant City and awarded her damages in the sum of $500,000. The jury also found in favor of the defendant administrator and against the plaintiff. Judgments were entered on the verdicts, and defendant City appeals.

At the time and the place of the occurrence, Fifth Street was designated a one-way street in a southbound direction. Between the 2300 and the 2400 blocks the grade of the street was depressed to go under the trestle of the Norfolk and Western Railroad tracks. The down slope began about 400 feet north of the center of the trestle and the level of the street returned to the normal grade about 400 feet south of the center of the trestle. The bottom of the underpass under the trestle was about 14 feet below the normal grade of the street. Except in the area of the underpass the street was 52 feet wide. A 12-foot-wide lane was marked off in the center of the street leaving lanes 20 feet wide on each side. These side lanes contained sufficient widths for parking by the curb in addition to space for a traveling lane. In the underpass the street narrowed on both sides eliminating the parking area but still leaving side travel lanes of at least 12 feet in width.

Five days prior to the occurrence, City's employees made two excavations in the east lane to repair a broken water main and then filled the holes and patched the surface with concrete. Awaiting the curing of the concrete, barricades were placed in front of the patches and flare

pots were placed on the pavement in front of the barricades. The front of the barricades was about 130 feet south of the point where the south upgrade from the underpass ended and the street became level. The patch work and barricades extended into the east lane to a point about 3½ feet east of the east line of the center lane, thus requiring motorists traveling in the east lane to turn into the center lane in order to pass the obstruction. The utility pole with which the McCarty car collided was some 170 feet south of the barricades and on the curb on the west side of the street. No warning signs or other indications of the barricades were placed to the north to warn those approaching of the obstruction.

Three eyewitnesses testified. Their testimony consistently showed that the McCarty car was traveling south at a high rate of speed, went under the trestle, changed lanes, skidded and ran into the utility pole. The witness most favorable to the plaintiff testified that the McCarty car was in the left lane as it went up the incline, braked and changed into the center lane at about the top of the incline south of the trestle and went into a skid. The other witnesses indicated that the McCarty car had turned into the center lane at an earlier point. Both of these witnesses were impeached, however, by prior inconsistent statements. Plaintiff also submitted evidence that skid marks believed by witnesses to be from the McCarty car began in the left lane and cut to the southwest toward the utility pole only 6 feet north of the barricades.

Plaintiff alleged that McCarty was guilty of willful and wanton misconduct and that the City was negligent in placing the barricades in the street without proper illumination and without proper warning to motorists whose vision of the barricades was obstructed by the crest of the return slope as they came through the underpass. Plaintiff also alleged that the City was negligent in failing to obey one of its ordinances prohibiting obstacles from being placed in the street without first obtaining a permit to do so signed by the city clerk and approved by the superintendent of streets and the city traffic engineer. The evidence was undisputed that the practice was for city employees as well as private contractors and others to obtain such a permit before obstructing a street and that no such permit was obtained here.

■■ In enacting the ordinance, the City recognized that the placement of barricades in the streets could be done more safely if a person with expertise in traffic engineering passed upon the plans for the placing of such obstructions and that in the absence of following this procedure barricades are likely to be put into the street in a way more likely to create a hazard and result in a collision. An obvious purpose of the ordinance was to diminish the danger to the users of the streets from such hazards. Steve Koskey, defendant's city traffic engineer, testified that he

was the person who had the responsibility of examining plans for placement of barricades and the approval of permits and that he would not have approved the method that was chosen here. He would have required the use of warning signs visible to the drivers and placed at several points through the underpass. He would also have required that a large number of barricades be placed in the left lane north of the obstruction, at such an angle as to gradually "channelize" the traffic into the center lane.

Thus, under the evidence the jury could have found that: (a) the failure to follow the requirements of the ordinance was negligence by City; (b) had the ordinance been followed and the plan submitted to the city traffic engineer, a better system of warning would have been used; (c) had the better warning system been used, the McCarty car would not have skidded and hit the utility pole; (d) City through its employees could have reasonably foreseen that if the ordinance were not followed an inferior system of warning of the barricades might be used and a collision might occur that would not happen if a better system of warning approved by a traffic engineer were used.

City, nevertheless, contends that the violation of the ordinance could not be found to be a proximate cause of the collision and that the admission of evidence on this subject over its objection was reversible error. In support of its contention, City cites *McInturff v. Chicago Title & Trust Co.*, 102 Ill.App.2d 39, 243 N.E.2d 657; *Curran v. Chicago & Western Indiana R.R. Co.*, 289 Ill. 111, 124 N.E. 330; *Wyatt v. Chesapeake & Potomac Telephone Co.* (1932), 158 Va. 470, 163 S.E. 370, 82 A.L.R. 386; and *Johnson v. St. Paul Mercury Insurance Co.* (La. App. 1969), 219 So.2d 524, 36 A.L.R.3d 1349, all of which involve claims of negligence arising out of the violation of a statute or ordinance. In each case the reviewing court ruled as a matter of law that the violation was not a proximate cause of the injury. In these cases, however, there was either no causal connection, either proximate or remote, between the violation and the injury, no foreseeability of the injury, or no duty owed to the plaintiff.

Closer to the mark is City's claim of analogy to the situation of the motorist driving without an operator's license required by statute. As stated in annotations at 16 A.L.R. 1108, 1117 (1922), and 163 A.L.R. 1375, 1387 (1946), decisions of the courts of most states hold that the violation of the statute requiring the license is not a proximate cause of damage caused by the unlicensed operator's driving. The most recent case in this State is *Westefer v. Rybacki*, 125 Ill.App.2d 66, 259 N.E.2d 810, where in an action by a 16-year-old motorcyclist against the operator of an automobile for personal injuries, evidence of the plaintiff's lack of

an operator's license was admitted into evidence and the jury given Illinois Pattern Jury Instruction 60.01 (as was done in the case under consideration). The appellate court reversed, holding that the statutory violation could not have been a proximate cause of the collision.

A purpose of the statutes requiring driver's license is to keep incompetent drivers off the highways and to protect the public from the hazards of their driving. It is reasonably foreseeable that if unlicensed drivers drive, the dangers of collisions are enhanced. If an unlicensed person does not violate the statute and does not drive, then he will not cause an accident. Accordingly, there is some analogy in the application of the doctrine of proximate cause between that situation and the one under consideration in this case.

The difference is illustrated by the decision of the predecessor to this court, the former Third District Appellate Court in *Wilson v. Hobrock*, 344 Ill.App. 147, 152, 100 N.E.2d 412, 415. The plaintiff, there, had built a motor bicycle from a bicycle and washing machine motor. He was operating it when he became involved in a collision and brought suit for damages charging negligence. The defendant contended that the dangerous construction of the vehicle was a proximate cause of the collision. He offered evidence of plaintiff's lack of either an operator's permit or a certificate of title. The opinion stated that the lack of license was "immaterial" to plaintiff's exercise of due care and that neither the statutory license, nor certificate of title provisions would have required that the vehicle submit to a "safety test."

■■ In the case under consideration, the ordinance did require the plans for the placement of the barricades in use at the time of the collision and the warnings of them to be given to the motorists to submit to a "safety test" to be administered by the city traffic engineer. The tests given to a person seeking a driver's license, on the other hand, pass upon that persons general ability to drive but not upon the particular manner that individual might be driving at the time of a collision. The causal connection between the violation of an operator's licensing statute and a collision is much more remote than that between the violation of the ordinance in question and the collision in question. The jury, here, could have found the violation of the ordinance to have been a proximate cause of the collision, and the trial court was not in error in permitting evidence of the violation to go to the jury.

Defendant City also complains of the admission of other evidence. In the daylight hours of December 28, 1972, almost 4 years after the occurrence, James Galloway, a professional photographer, had the barricades replaced as they were at the time of the occurrence. Flare pots were placed in front of the barricades but were not lighted. He then drove

from the north side of the trestle through the underpass to the barricades three times, using a different traffic lane each time. As he did this he made a moving picture of the area ahead of the car, taken from the eye level of the driver. He testified that the barricades were more visible in the daylight when the picture was taken than they were on the night of the occurrence.

Over defendant City's objection this movie was shown to the jury for the limited purpose of showing the physical surroundings north and south of the trestle and to show the points at which the barricades became visible to a person traveling the way. The jury was expressly told that the movie was not intended to be a re-creation of the route of the McCarty car prior to the collision. Photographs which showed various views of the road, the barricades and the wrecked automobile taken on the night in question were also admitted into evidence.

■■ The parties agree that moving pictures are a series of still pictures and that the general rules as to the admission of photographs into evidence are applicable to movies. Defendant City contends that the movies were posed, not taken of the exact path followed by the McCarty car, nor at the speed it was traveling and were taken under different conditions because the flare pots were lighted at the time of the collision but not when the daytime movies were taken. Both parties cite the following as an accurate statement of Illinois law on the use of posed photographs:

"RULE 337. POSED PHOTOGRAPHS

Subject to the discretion of the trial judge on preliminary inquiry to determine whether a photograph accurately portrays the scene reconstructed, and to protect the adverse party from unfair disadvantage, a posed photograph of a reconstructed scene or of persons or objects in assumed positions, is generally admissible; but the Illinois courts, in the published decisions, have looked upon such photographs with disfavor." Gard, Illinois Evidence Manual R. 337 (1963).

Had the movies been purported to be taken from a car traveling at the speed and over the exact trail of the McCarty car, they would have been more posed, more of a reenactment and more likely to prejudice defendant by any slight deviation from conditions as they existed when the collision occurred. The main purpose of the movies was to show the point at which the barricades became visible as a motorist coming from the north approached the crest of the south incline of the underpass. The failure to light the flare pots did not interfere with this. The photographs taken on the night in question supplemented the movies. Accordingly, we hold the differences in conditions between the time of

the taking of the movie and the time of the occurrence to be insufficient to make the admission of the movie reversible error.

Over City's objection, Carter Jenkins, a professional consulting engineer, was permitted to testify "In my opinion, the barricades shown in the pictures taken by Mr. Galloway were not in proper position to provide adequate protection for oncoming traffic using South Fifth Street." Defendant argues that testimony was improper because it gave an opinion going to an ultimate issue on a matter that was within the understanding of the average juror when there were eyewitnesses to the occurrence and no necessity for such testimony was shown.

■■ In *Merchants National Bank v. Elgin, Joliet & Eastern Ry. Co.*, 49 Ill.2d 118, 120, 273 N.E.2d 809, 810, an action for personal injuries arising out of a crossing collision, an expert was permitted to testify that the crossing was "very inadequately protected." In affirming, the supreme court majority opinion noted that the lack of an eyewitness is a prerequisite for an expert opinion only when the expert testimony is used to reconstruct what happened at time in question for if eyewitnesses were present, they can supply this information. The opinion then rejected the argument that the hazards of a crossing are within the ken of the average juror and emphasized that the Illinois Commerce Commission hears the testimony of experts in determining the type of protection required at a crossing and that the jury should be entitled to the same information. The argument that the answer of the witness improperly spoke to the ultimate issue was also rejected on the grounds that the opinions in *Clifford-Jacobs Forging Co. v. Industrial Commission*, 19 Ill.2d 236, 166 N.E.2d 582, and *Miller v. Pillsbury Co.*, 33 Ill.2d 514, 211 N.E.2d 733, "make it clear that since the trier of fact is not required to accept the opinion of the expert, such evidence does not usurp the province of the jury." (49 Ill.2d 118, 122.) In *Coleman v. Illinois Central R.R. Co.*, 13 Ill.App.3d 442, 300 N.E.2d 297, this court followed *Merchants* in ruling that it was not error to allow an expert to testify that a crossing was inadequately protected.

Defendant maintains that the questions involving the safety of a crossing and that of barricades in the street are vastly different because the question of construction and safety devices at a crossing is much more complex. There the Illinois Commerce Commission utilized expert advice and here City by its own ordinance provided for the same from its traffic engineer. The city ordinance indicated a policy of not leaving the safety of the placement of the barricades to lay opinion. Such expert opinion was also helpful to the jury here. We believe *Merchants* to be dispositive of the propriety of the questioned testimony of Carter Jenkins.

■■ General Motors Corporation had been sued on the theory that the car in which plaintiff was riding was defectively constructed causing it to break and, thus enhancing her injuries. The evidence was that it virtually broke in two upon hitting the utility pole and that the injuries were greatly enhanced thereby. After General Motors Corporation was dismissed as a defendant and prior to trial, plaintiff's motion *in limine* for an order prohibiting defendant from mentioning before the jury that General Motors was or might be a defendant or might be responsible for part of her injuries was allowed. City contends that it was entitled to show that General Motors' negligence might be the sole proximate cause of plaintiff's injuries or enhanced them. Since there was no evidence that the car malfunctioned or broke prior to hitting the pole, General Motors' negligence could not be the sole proximate cause of the injuries. The answer to the claim that City was entitled to show that the injuries were enhanced by General Motors tort is not as clear, and no cases clearly in point are cited by either party. In *Gerty v. Campbell*, 55 Ill.2d 84, 302 N.E.2d 40, it was held that the original tortfeasor is liable for injuries resulting from malpractice by a doctor selected by the injured party, without negligence, while furnishing treatment for the original injury. Plaintiff's enhanced injuries resulting from the breaking of the car are also consequential injuries for which City is liable (see Comment, *Auto Design: Manufacturers' Duty to Reasonably Protect Occupants Against the Effects of Collision*, 1969 U. Ill. L.F. 396). The joint liability of General Motors would not relieve City of its liability and would be immaterial to the jury. The ruling on the motion *in limine* was not error.

■■ Counsel for the defendant administrator of the McCarty estate stated in final argument:

> "This barricade, placed where it was, I think formed as effective a trap for southbound vehicles in the east lane as if the city had deliberately designed it to kill and maim people. They didn't. But it was a trap, nevertheless, and it was a trap that worked—."

Defendant objected to this argument and moved for a mistrial. The trial judge overruled the objection and denied the motion for a mistrial. Since the argument itself clearly indicated that the city did not intend to set a trap, the trial judge did not abuse his discretion in his ruling on the objection.

We find no reversible error to have occurred. The judgment is affirmed.

Affirmed.

SIMKINS, P. J., and CRAVEN, J., concur.