**Edward L. MACKEY, Committee for Laura B. Clark, an incompetent, and Robert Edward Clark, Appellants,**

v.

**GREENVIEW HOSPITAL, INC., N. K. Kirby, L. Jack Scott, Richard F. Grise, and John P. Blackburn, Appellees.**

Court of Appeals of Kentucky.

Feb. 2, 1979.*

Rehearing Denied May 11, 1979.

Discretionary Review Denied Oct. 23, 1979.

---

*The decision of the panel was made prior to January 1, 1979, but the opinion was not rendered until this date.

Edward M. Post, Taustine, Post, Berman, Fineman & Kohn, Louisville, for appellants.

Maxey B. Harlin, William J. Parker, Harlin, Parker & Rudloff, Bowling Green, for appellees Greenview Hospital, Inc. and Hospital Corporation of America.

John T. Ballantine, Ogden, Robertson & Marshall, Louisville, Joseph R. Huddleston, Bowling Green, for appellees Richard F. Grise and John P. Blackburn.

William O. Guethlein, William P. Swain, Boehl, Stopher, Graves & Deindoerfer, Louisville, for appellees N. K. Kirby and L. Jack Scott, and Kirby & Scott, P.S.C.

Before PARK, VANCE and WINTERSHEIMER, JJ.

PARK, Judge.

This is an appeal from a judgment entered on a jury verdict for the defendants in a medical malpractice case. During the course of a breast biopsy, Laura Clark suffered cardiac arrest. Massive and irreversible brain damage ensued from the cardiac arrest. The plaintiffs-appellants are Mrs. Clark's committee and her husband who has asserted a claim for loss of consortium.[1] The biopsy was performed at the defendant-appellee, Greenview Hospital. Mrs. Clark's surgeon was the defendant-appellee, Dr. Richard F. Grise. Her anesthesiologists were the defendants-appellees, Drs. N. K. Kirby and L. Jack Scott. The remaining defendant-appellee, Dr. John P. Blackburn, was sued only is his capacity as a partner of Dr. Grise.

After a trial involving thirteen sessions between February 20 and March 9, 1976, the jury returned a verdict for all of the defendants. On this appeal, the appellants have raised the following issues: (1) that the trial court erred in failing to sustain three challenges for cause during the voir dire examination of the jury; (2) that the trial court erred in instructing the jury on contributory negligence of Mrs. Clark; and (3) that the trial court erred (a) in its instructions on the duties of the physicians, (b) in allowing six peremptory challenges to the physicians, and (c) in allowing improper closing argument.

FACTUAL BACKGROUND

Prior to her admission to the Greenview Hospital on October 2, 1973, Mrs. Clark was using the drug Lasix in an amount and with a frequency which is not known. Lasix is a potent diuretic which can deplete the body's store of potassium. A low level of potassium increases the risk of cardiac arrest during anesthesia. In the event of cardiac arrest, a low potassium level can interfere with the restoration of normal heart function.

For the purposes of this appeal, we can assume that Mrs. Clark's use of Lasix caused a potassium deficiency. The potassium deficiency was a substantial factor in causing the cardiac arrest and the difficulty encountered in restoring normal heart function. The factual issue in this case is whether the defendants had prior knowledge that Mrs. Clark was using Lasix. If the defendants had knowledge of her use of Lasix, surgery should have been postponed. Such knowledge would also have indicated that the cardiac arrest was attributable to a potassium deficiency which could have been remedied promptly without extensive brain damage. At trial, Mrs. Clark's committee contended that the defendants knew, or by the exercise of ordinary care should have known, that she was using Lasix. On the other hand, the defendants contended that Mrs. Clark gave a false history to Dr. Scott and to Dr. Kirby with the result that surgery proceeded without any precautions being taken to avoid the risk incident to a low potassium level.

1. For convenience, the appellants will be referred to only as Mrs. Clark's committee.

Both Dr. Grise and Dr. Scott testified that they took separate pre-operative histories from Mrs. Clark on the night prior to surgery. According to both doctors, Mrs. Clark failed to inform them that she was suffering from a heart condition or that she was using either Lasix or nitroglycerine. All of the physicians testified that they had no knowledge from any source that Mrs. Clark was using Lasix or suffered from heart disease.

On the other hand, it is undisputed that, upon admission to Greenview Hospital the day prior to surgery, Mrs. Clark informed a floor nurse, Charlotte Reeves, that she was using Lasix. Nurse Reeves completed a Greenview Hospital form entitled "Admission Information and Nursing Care Data." Under the heading "MEDICATIONS" Nurse Reeves indicated that Mrs. Clark was using Lasix but had left the medication at home. The "Admission Information and Nursing Care Data" sheet was designed by the nursing staff of the hospital for their own use. In addition to numerous items of information which would assist in providing nursing care, the sheet covered items completely unrelated to nursing care. For example, the sheet required the nurse to indicate that she had instructed the patient concerning the television controls and use of the room telephone. Information was included respecting religion and personal clergy. Although designed primarily for the use of the nursing staff, the treating physicians would from time to time refer to the sheet if present in the patient's hospital chart.

Dr. Grise and Dr. Scott testified that they never saw the "Admission Information and Nursing Care Data" sheet and its reference to Lasix when each obtained a pre-operative history from Mrs. Clark the night before surgery. Dr. Kirby testified that the "Admission Information and Nursing Care Data" sheet was not in Mrs. Clark's chart which accompanied her to the operating room.

## CHALLENGE TO JURORS FOR CAUSE

Mrs. Clark's committee contends that the trial court erred in failing to strike for cause three prospective jurors. During the voir dire examination, the three jurors in question revealed some prior professional relationship with one or more of the physicians involved in the case. The juror Fisher stated that Dr. Grise had "sutured up one of my youngsters a time or two from small accidents . . . several years back." Fisher also stated that he respected Dr. Grise as a result of his personal acquaintance. However, Fisher also stated that he would not find it difficult to return a verdict against Dr. Grise if justified by the evidence. The juror Langley stated that she had been a former patient of Dr. Grise five or six years earlier. This juror also stated that she would require no more evidence against Dr. Grise than she would respecting any other physician and that her verdict would be governed solely by the evidence. Langley also indicated that she had been treated by Dr. Scott when he first commenced his practice, but she again indicated that the previous relationship would not affect her verdict. The juror Solley had at one time been a regular patient of Dr. Grise. However, in the five or six year period immediately prior to trial, Solley had seen Dr. Grise on only one occasion, approximately eight months prior to trial. She had also been treated by Dr. Grise's partner, Dr. Blackburn, approximately 5 to 10 years earlier, and by a witness in the case, Dr. McCormick, in 1948. The juror Solley stated that her verdict would not be affected by her acquaintanceship with any of the physicians in question.

■ The trial court did not err in overruling the challenges for cause to the jurors Fisher, Langley and Solley. There was no current or continuing professional relationship between any of the jurors or members of their immediate family and any of the physicians involved in the case. The jurors were carefully examined by the trial court and the attorneys. All affirmed their ability to render a fair and impartial verdict solely on the basis of the evidence in the case. The relationship between the jurors and Dr. Grise and the other physicians was

not so substantial as to require a finding that the jurors were biased and unable to afford Mrs. Clark a fair trial. *Whitney v. Louisville & N. R. Co.*, 296 Ky. 381, 177 S.W.2d 139, 141 (1944).

The juror Fisher also indicated his general antipathy toward medical malpractice actions. He felt that many doctors had been abused in such suits. However, Fisher was very careful to state that his views on malpractice litigation would have nothing to do with the case being tried. He affirmed that doctors should pay for their mistakes. There is nothing to suggest that Fisher had any preconceived notion regarding the merits of this case. Likewise, the record does not suggest that Fisher's admitted aversion to malpractice litigation would affect his impartiality in weighing the factual issues to be tried. *Davidson v. Grigsby*, Ky., 451 S.W.2d 632, 634 (1970).

In *Peters v. Commonwealth*, Ky., 505 S.W.2d 764, 765 (1974), the court stated:

> It is elementary that the determination of whether to excuse a prospective juror rests within the sound discretion of the trial judge and ought not to be set aside by a reviewing court unless the error is manifest.

All of the jurors professed their ability to render a fair and impartial verdict in the case. The trial judge was in a far better position than this court to determine whether a juror should be excused for cause even though professing the ability to be fair and impartial. In the present case, the voir dire examination of the jury was extensive, covering two volumes of the transcript. The trial judge carefully impressed the jury panel with the importance of securing fair and impartial jurors. In fact, the trial judge excused many prospective jurors for cause. We find no abuse of discretion by the trial judge in refusing to excuse the jurors Fisher, Langley and Solley for cause.

## PATIENT'S HISTORY: NEGLIGENCE AND CONTRIBUTORY NEGLIGENCE

In this case, the question of negligence of the treating physicians and the hospital is closely related to the question of contributory negligence of Mrs. Clark in giving an incomplete or inaccurate history. The completeness and accuracy of the information furnished by Mrs. Clark is a factor in determining whether the physicians and the hospital exercised ordinary care. In turn, whether Mrs. Clark exercised ordinary care for her own safety in giving her history would be influenced by whether the physicians and the hospital exercised ordinary care in obtaining the history from her.

Whether a physician is negligent in making a diagnosis must be determined in light of the existing circumstances including the facts then known to him, rather than on the basis of facts which are revealed by later developments. *Engle v. Clarke*, Ky., 346 S.W.2d 12, 17 (1961). The patient's history is an important circumstance. The failure of a physician to receive a full and accurate history from the patient may provide a basis for finding that the physician was not guilty of malpractice. *Johnson v. St. Paul Mercury Ins. Co.*, La. App., 219 So.2d 524, 528–29, 36 A.L.R.3d 1349 (1969); *Amdur v. Zim Israel Navigation Co.*, 310 F.Supp. 1033, 1036 (S.D.N.Y. 1969); *Tangora v. Matanky*, 231 Cal.App.2d 468, 42 Cal.Rptr. 348 (1974). On the other hand, the physician's failure to consider the history given by the patient may constitute malpractice. *Yorston v. Pennell*, 397 Pa. 28, 153 A.2d 255, 85 A.L.R.2d 872, 15 N.C.C. A.3d 419 (1959); *Walstad v. University of Minnesota Hospitals*, 442 F.2d 634, 640–41 (8th Cir. 1971).

For his own safety, a patient must exercise ordinary care to give an accurate history to his treating physician. He must tell the truth. Otherwise, the patient may mislead the physician, with disastrous results. Because the patient's self-interest dictates that he tell the truth, the history given to a treating physician is deemed particularly reliable, and it is admissible into evidence as an exception to the hearsay rule. *Omberg v. United States Mutual Ass'n*, 101 Ky. 303, 19 Ky.L.Rep. 462, 40 S.W. 909, 72 Am.St.Rep. 413 (1897). In determining what constitutes contributory

negligence in giving a history, consideration must be given to the special relationship that exists between patient and physician. In *Adams v. Ison*, Ky., 249 S.W.2d 791, 793 (1952), that relationship was described in the following manner:

> The relationship of a patient to his physician is by its very nature one of the most intimate. Its foundation is the theory that the physician is learned, skilled and experienced in the afflictions of the body about which the patient ordinarily knows little or nothing but which are of the most vital importance to him. Therefore, the patient must necessarily place great reliance, faith and confidence in the professional word, advice and acts of his doctor.

The physicians had the primary responsibility for obtaining a complete and accurate history from Mrs. Clark.

In *Favalora v. Aetna Casualty & Surety Co.*, La.App., 144 So.2d 544 (1962), the patient suffered injuries when she fell during an x-ray examination. The court held that the radiologist's insurer was liable, stating:

> It appears reasonably certain from the record that had a clinical history been taken of the plaintiff, it would have revealed that one of the reasons for her examination was to determine, if possible, the cause of her having fainted. Although Plaintiff could have volunteered such information, it is clearly shown that she was not questioned with respect thereto. She was under no duty to reiterate her entire medical history to each of the hospital personnel with whom she came in contact but was entitled to rely upon the skill of her personal physician and the competence of the specialists into whose care and keeping she had been committed for examination. Lacking the specialized training of the hospital personnel, she could hardly be expected to select and communicate to her examiners the pertinent and relevant aspects of her medical history. However, the specialist conducting the highly technical examination involved could reasonably be expected to both know what information was important to the examination and plain-

tiff's general welfare as well as elicit same from plaintiff before commencing the tests ordered.

*Id.*, at 550. *See also O'Neil v. State*, 66 Misc.2d 936, 323 N.Y.S.2d 56, 61 (1971).

Mrs. Clark was under a duty to exercise ordinary care for her own safety in giving her medical history. Whether she exercised such care will be influenced by whether the questions propounded by Drs. Scott and Grise were sufficient to apprise her of the necessity of communicating particular aspects of her medical history. *Cf. Post v. American Cleaning Equipment Corp.*, Ky., 437 S.W.2d 516, 520 (1969). Mrs. Clark was under no general duty to diagnose her own condition or to volunteer information. She could reasonably expect that the physicians and nurses would ask the proper questions. Unless the physicians or nurses exercised ordinary care in obtaining the history, the patient's failure to communicate a particular aspect of his medical history ordinarily will not constitute contributory negligence.

A different situation may exist if the patient is aware that the treating physician has failed to ascertain some aspect of the patient's medical history which the patient knows involves a risk of harm to the patient during the course of future medical treatment. In such cases, ordinary care may dictate that the patient volunteer the additional information to the treating physician. Otherwise, the patient may be deemed to have voluntarily and unreasonably encountered a known risk. *See Parker v. Redden*, Ky., 421 S.W.2d 586 (1967); *Houchin v. Willow Avenue Realty Co.*, Ky., 453 S.W.2d 560 (1970).

To summarize, contributory negligence on the part of a patient in relating medical history is directly related to the care taken by the physician and nurses in obtaining the history. The patient is contributorily negligent if a reasonably prudent person would know that the history was false and misleading. When the physicians or nurses are negligent in obtaining the history, the patient is contributorily

negligent only if he knows the physician is unaware of a condition which imposes a risk of danger to the patient and his failure to inform the physician of the condition is unreasonable under the circumstances.

So far we have considered the question of medical malpractice solely on the basis of the patient's history. Although the patient's history is important, it is not the only factor upon which the physician makes his diagnosis or bases his treatment. Consequently, a physician may exercise ordinary care in obtaining the patient's history but be guilty of malpractice in some other regard. Would the patient's contributory negligence in giving a false or misleading history be a bar to recovery if the physician by the exercise of ordinary care should have known of that aspect of the patient's medical history without regard to the actual history related by the patient? Again, the physician may have actual knowledge of the facts which the patient negligently failed to relate in giving his medical history. In such case, would the patient's contributory negligence be a bar?

The recent decision of the Supreme Court in *Southeastern Kentucky Baptist Hospital v. Bruce*, Ky., 539 S.W.2d 286 (1976), suggests that a patient's contributory negligence in giving a history may not be a bar to recovery in all cases. In that case, the defendants performed a thyroidectomy on the wrong patient. The defendant hospital contended that the patient was negligent in responding to the wrong name prior to surgery. The court rejected this argument. The patient wore an identification bracelet, and the court held that the surgical team in the operating room was under the duty of establishing with "absolute certainty" the identity of the patient.

The *Bruce* case was not decided until after the trial in this case. In the objections to the instructions, Mrs. Clark's committee did not raise the issue considered in the *Bruce* case. The committee offered only three grounds for objection to the contributory negligence instruction given by the trial court, namely: (a) that there was no evidence that Mrs. Clark knew or should have known she had a heart condition; (b) that she was entitled to an instruction on comparative negligence; and (c) that she was entitled to a last clear chance instruction. Under CR 51(3), our consideration of the contributory negligence instruction must be limited to the specific objections made to the trial court.

## EVIDENCE OF PREEXISTING HEART CONDITION

The contributory negligence instruction given by the trial court was based upon the dual premise that Mrs. Clark had "a pre-existing heart condition" which was "known" or "should have been known" to her and that she failed to convey this information to the physicians. Mrs. Clark's committee objected to the instruction on the ground that there was no evidence that Mrs. Clark knew or should have known she had a pre-existing heart condition. In determining whether there was sufficient evidence upon which to base the contributory negligence instruction given by the trial court, we must view the testimony in the light most favorable to the defendants.

There was no direct evidence that Mrs. Clark knew that she was suffering from a pre-existing heart condition. However, there was substantial circumstantial evidence upon which to base the instruction. Approximately two weeks prior to the surgery, Mrs. Clark experienced an episode of severe chest pain and vomiting. She had been sweaty and pale. There was evidence that Mrs. Clark had for some time been taking nitroglycerine for chest pain. Nitroglycerine is prescribed primarily in the treatment of heart disease. Mrs. Clark was admittedly taking Lasix which is a potent diuretic, primarily used in the treatment of heart disease. In the opinion of Dr. Hasbrouck, the cardiac arrest was caused by pre-existing heart disease combined with the low level of potassium induced by Lasix.

Dr. Scott testified that he asked Mrs. Clark whether she had been taking any drugs or medication and that she said she had not. He also testified that she specifi-

cally denied that she had heart disease. Dr. Grise testified that Mrs. Clark denied taking any medication and that she failed to give any indication of heart disease.

 We conclude that there was sufficient evidence of probative value upon which the jury could find that Laura Clark suffered from a pre-existing heart disease, that she knew or should have known of the heart disease, that she misled her physician about the condition, and that her failure to give a true history to the physicians was a substantial factor in the cardiac arrest during surgery.

## COMPARATIVE NEGLIGENCE

 Mrs. Clark's committee urges this court to repudiate the common law rule of contributory negligence in favor of a theory of comparative negligence. However, this court is bound to follow the opinions of our Supreme Court and its predecessor court. SCR 1.030(8)(a). This state's highest court has consistently refused to adopt the theory of comparative negligence. *E. g. Williams v. Chilton*, Ky., 427 S.W.2d 586, 591 (1968). This court has followed those decisions. *Vinson v. Gobrecht*, Ky.App., 560 S.W.2d 242 (1977). If the long line of opinions upholding the common law defense of contributory negligence is to be overruled, then that decision must emanate from the Supreme Court rather than this court. *See Hoffman v. Jones*, Fla., 280 So.2d 431, 433–34 (1973).

## LAST CLEAR CHANCE

Mrs. Clark's committee asserts that the trial court erred in failing to give a last clear chance instruction to the jury. Trial counsel for the committee did not tender a last clear chance instruction, nor did counsel explain to the trial judge in what way any of the defendants had a last clear chance to avoid injury to Mrs. Clark. The record merely contains an objection to the failure to give a last clear chance instruction without further explanation. The doctrine of last clear chance seems more at home on the highway than in the operating room. Nevertheless, we shall consider whether a last clear chance instruction would have been appropriate.

A last clear chance instruction would have been applicable only if the jury found that Mrs. Clark was contributorily negligent in giving a false or misleading history to Drs. Scott and Grise. On this appeal, Mrs. Clark's committee does not contend that any of the physicians had actual knowledge that she was using Lasix or that she suffered from a pre-existing heart condition. Nor does her committee argue that the hospital was aware that Mrs. Clark had given a false and misleading pre-operative history to both Dr. Scott and Dr. Grise. Instead, her committee argues that, by the exercise of ordinary care, the physicians should have discovered that she was using Lasix and that the hospital should have informed the physicians that she was using Lasix.

In evaluating this argument, it is appropriate to consider the specific allegations of negligence made by Mrs. Clark's committee against each of the defendants. The committee's brief on appeal states:

Dr. Grise: Laura Clark's surgeon. Negligent failure to obtain proper history and learn Mrs. Clark taking LASIX prior to surgery.

Dr. Blackburn: Dr. Grise's partner. No negligence. Sued in partnership capacity only.

Dr. Scott: Anesthesiologist, responsible for obtaining pre-anethesia drug history including fact Mrs. Clark taking LASIX.. Negligent failure to perform responsibility.

Dr. Kirby: Anesthesiologist at surgery. Negligent failure to examine page of hospital record showing Mrs. Clark taking LASIX (assuming page was in hospital record).

Greenview Hospital: Hospital. Negligent failure to place page showing Mrs. Clark taking LASIX in hospital record or otherwise properly inform doctors of that fact.

With the exception of Dr. Kirby, the alleged negligence of each defendant oc-

curred prior to the commencement of surgery.

If Mrs. Clark was contributorily negligent in giving a false or misleading pre-operative history, she was able to correct the misinformation prior to surgery. Until she was unable to communicate because of medication or anesthetics, Mrs. Clark had the opportunity to avoid injury to herself by giving a correct history. There is nothing in the record to suggest that either Dr. Scott or Dr. Grise had a last clear chance to avoid Mrs. Clark's ultimate injury. There is no evidence that either Dr. Scott or Dr. Grise was in any way negligent after Mrs. Clark was taken to surgery. *See Rochester v. Katalan*, Del.Supr., 320 A.2d 704, 708 (1974).

Likewise, there is no evidence that the hospital had a last clear chance to avoid Mrs. Clark's injury. The "Admission Information and Nursing Care Data" sheet was not intended as a pre-operative history. Nurse Reeves was interested only in knowing what drugs or medication Mrs. Clark may have brought with her or left at home. She was completely unaware of the possible effect that the prior use of Lasix might have during surgery. Even if the significance of the use of Lasix had been known to the floor nurses, there is no evidence that they were aware that Mrs. Clark had given an incomplete or misleading history to Drs. Scott and Grise. Any negligence on the part of the hospital involved either the failure of Nurse Reeves to record the information regarding Lasix in the "Nurses' Notes" where it would have been seen by the physicians or the failure to include the "Admission Information and Nursing Care Data" sheet in the chart which accompanied Mrs. Clark to surgery. Such negligence would not involve a last clear chance.

With respect to Dr. Kirby, a more difficult problem is presented. Mrs. Clark's committee alleges that he was negligent during surgery by failing to examine the "Admission Information and Nursing Care Data" sheet and discover that Mrs. Clark was using Lasix. After Mrs. Clark was rendered unconscious by the administration of anesthetics, she became a "helpless plaintiff" who was unable to avoid the ultimate injury. If by the exercise of ordinary care, Dr. Kirby could have discovered Mrs. Clark's peril, then there would be room for application of the last clear chance doctrine. *See Beasley v. Standard Paving & Engineering Co.*, Ky., 511 S.W.2d 667, 669, fn. 1 (1974); Restatement (Second) of Torts § 479 (1965). If there was evidence that the "Admission Information and Nursing Care Data" sheet was in the hospital chart which accompanied Mrs. Clark to the operating room, a strong case could be made for the application of the last clear chance doctrine.

When Mrs. Clark suffered cardiac arrest and Dr. Grise was unable to restore normal heart function, Dr. Kirby went through Mrs. Clark's hospital chart page by page looking for some clue to the cause of the cardiac arrest. Dr. Kirby testified that the "Admission Information and Nursing Care Data" sheet was not in the chart. Dr. Kirby then handed the chart to a nurse anesthetist, Ms. Thorn, and had her examine the chart. Ms. Thorn testified that she examined the chart page by page and that the "Admission Information and Nursing Care Data" sheet was not a part of the chart. Other persons in the operating room testified to the page by page examination of Mrs. Clark's hospital chart by Dr. Kirby and Nurse Thorn.

An anesthesia aide, Ms. Boucher, completed the anesthesia record prior to the administration of anesthetics to Mrs. Clark. Ms. Boucher testified that the "Admission Information and Nursing Care Data" sheet was not in the hospital chart. Her testimony is based upon the fact that she was required to ask Mrs. Clark regarding her height and weight. If the "Admission Information and Nursing Care Data" sheet had been in the chart, Ms. Boucher would not have asked Mrs. Clark for the information, but would have taken the information from the admission sheet.

On the other hand, Nurse Reeves testified that the "Admission Information and Nursing Care Data" sheet was completed shortly

after Mrs. Clark was admitted on the afternoon of October 22. According to Nurse Reeves, she gave the admission sheet to the floor clerk in charge of the records, Robin Moses. Ms. Moses testified that she placed the admission sheet in Mrs. Clark's hospital chart. Nurses Meador and Huffman completed the pre-operative check list during the early morning hours of October 23. Both testified that they utilized the "Admission Information and Nursing Care Data" sheet in completing the pre-operative check list. According to Nurse Huffman, she did not take the admission form out of the chart when she completed the pre-operative check list around 8:00 A.M.

Although there was evidence that the "Admission Information and Nursing Care Data" sheet was in the hospital chart around 8:00 A.M., there is no direct evidence that the admission sheet was in the hospital chart when Mrs. Clark was taken to surgery around noon. Significantly, the records clerk on duty on the morning of October 23 did not testify. There was also evidence that the "Admission Information and Nursing Care Data" sheet was frequently omitted from the hospital chart which accompanied the patient to the operating room.

After giving careful consideration to the transcript, we conclude that there was no evidence that Dr. Kirby, by the exercise of ordinary care, should have discovered that Mrs. Clark was using Lasix from an examination of her hospital chart in the operating room. The trial court did not err in failing to give a last clear chance instruction with respect to Dr. Kirby.

In holding that the trial court did not err in failing to give a last clear chance instruction, we do not intend to approve the form of the contributory negligence instruction actually given. The form of the contributory negligence instruction has never been questioned.

### EXCESS PEREMPTORY CHALLENGES

The trial court granted the defendants nine peremptory challenges allocated as follows: three to Greenview Hospital, three to Drs. Grise and Blackburn, and three to Drs. Kirby and Scott. Mrs. Clark's committee contends that the trial court erred in granting six peremptory challenges to the four physicians. The committee contends that the interests of the physicians at trial were not antagonistic.

Multiple defendants are entitled to additional peremptory challenges under KRS 29.290 if their interests are antagonistic. At the time the trial commenced on February 20, 1976, cross-claims had been asserted between Drs. Grise and Blackburn on the one hand and Drs. Kirby and Scott on the other. Even more important, the physicians were charged with independent acts of negligence. As the court stated in *Roberts v. Taylor*, Ky., 339 S.W.2d 653, 656 (1960):

> Where the defendants in a personal injury action are changed with independent acts of negligence . . . the interests of the defendants are most always antagonistic, because each may escape liability or reduce his liability by convincing the jury that the other was solely or primarily responsible. The assertion of cross-claims for indemnity or contribution will merely formalize the antagonism of interest in this regard.

At the time the jury was selected, the interests of the two teams of physicians were antagonistic. The trial court did not err in granting six peremptory challenges to the physicians. It is immaterial that the cross-claims between the two teams of physicians were withdrawn at the end of the trial on March 8, 1976.

### INSTRUCTIONS ON PHYSICIAN'S DUTIES

Based upon an isolated statement contained in *Johnson v. Vaughn*, Ky., 370 S.W.2d 591, 596 (1963), Mrs. Clark's committee requested that the jury be instructed that the duty of the physicians was to be performed according to the "exigencies" of the case and proportionate to the "dangers to be apprehended and guarded against." The instructions given by the trial court were based upon the subsequent decisions

in *Massey v. Heine*, Ky., 497 S.W.2d 564, 566 (1973), and *Blair v. Eblen*, Ky., 461 S.W.2d 370, 373 (1970). With respect to the duty of Dr. Grise, the instruction given by the court provided:

> It was the duty of the defendant, Doctor Richard F. Grise, in performing the surgery which he performed on Laura B. Clark and in his treatment of her as a patient, to know and exercise that degree of care, including consideration of hospital records concerning Laura B. Clark, which ordinarily careful, skilled and prudent physicians specializing in surgery know and exercise *under circumstances like or similar to those shown in this case.* (emphasis added).

The instructions given respecting the duties of Dr. Kirby and Dr. Scott were similar, the only significant difference being a reference to anesthesiology services rather than surgery.

The trial court did not err in refusing to give the tendered instruction. The factors enumerated in the tendered instruction were encompassed within the language emphasized above in the instructions actually given by the trial court. The "exigencies" of the case and the "danger to be apprehended and guarded against" were merely some of the circumstances of the case. A separate instruction was not required. These were matters to be mentioned by counsel in closing argument.

## CLOSING ARGUMENT

 During the direct examination of Dr. Hasbrouck, senior anesthesiologist at the University of Kentucky Medical Center, the attorney for Drs. Scott and Kirby elicited the information that one of the attorneys for Mrs. Clark had requested Dr. Hasbrouck to evaluate the medical chart relating to Mrs. Clark. On this appeal, Mrs. Clark's committee asserts that the trial court erred in overruling an objection to the following portion of the closing argument of the attorney for Drs. Scott and Kirby:

> [H]e tells you that Leibson and Mussler brought this chart to him in August of '74 and he says there's nothing wrong. So

what do they do? They go shopping for some hired guns out of the east.

The trial court did not err in overruling the objection to this argument.

First, it was not improper to comment upon the failure of the appellants to call Dr. Hasbrouck as a witness. *Commonwealth Power Ry. & Light Co. v. Vaught,* 191 Ky. 641, 231 S.W. 247, 249 (1921). Second, the argument constituted fair comment on Dr. Hasbrouck's testimony. Dr. Hasbrouck testified in part as follows:

> Q 30 Now, Doctor, you have looked at this chart and the anesthesiology record of Doctor Kirby. Based on your examination of that anesthesiology record, do you feel that Doctor Kirby rendered good care, medical care to Laura Clark?
>
> A. Superb.

The trial court properly overruled the objection to the argument in question.

## RULING

The judgment of the circuit court is affirmed.

VANCE, J., concurs.

WINTERSHEIMER, J., concurs by separate opinion.

WINTERSHEIMER, Judge, concurring.

I concur in the result reached by the majority because I believe the record does not indicate sufficient grounds to overturn the decision reached by the jury as the trier of fact. I do not consider this opinion to be an unqualified endorsement of the course of conduct engaged in by any of the appellees.